UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

KAREN FINDLEY,                    )
                                  )
            Plaintiff,            )
                                  )
      vs.                         )        Case No. 1:04CV00186 AGF
                                  )
JO ANNE B. BARNHART,              )
Commissioner of Social Security,  )
                                  )
            Defendant.            )


**<u>MEMORANDUM AND ORDER</u>**

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security, denying Plaintiff Karen Findley's application for

Supplemental Security Income (SSI) under Title XVI of the Social Security Act (SSA),

42 U.S.C. §§ 1381, et seq.[1]  For the reasons set forth below, the Court will affirm the

decision of the Commissioner.

Plaintiff, who was born on August 19, 1957, applied for SSI disability benefits on

July 3, 2002, alleging a disability onset date of January 1, 2002, due to anxiety,

depression, and tendinitis in her arms.  Following a hearing on April 3, 2003, an

Administrative Law Judge (ALJ) found on September 22, 2003, that Plaintiff was not

disabled.  The Appeals Council of the Social Security Administration remanded the case

to the ALJ for further vocational expert (VE) testimony.  A second hearing was held on

---

[1]     The parties have consented to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

June 25, 2004, before a different ALJ, and on August 30, 2004, this ALJ found that Plaintiff was not disabled. On November 8, 2004, the Appeals Council denied Plaintiff's request for review. Plaintiff has thus exhausted all administrative remedies, and the ALJ's August 30, 2004 decision stands as the final agency action.

Plaintiff argues that the ALJ erred in placing substantial weight on a consulting physician's opinion and discounting the opinion of Plaintiff's treating psychiatrist, in assessing a residual functional capacity (RFC) that was not based upon substantial medical evidence, in relying upon the answer of the VE to a hypothetical question that did not include all of Plaintiff's limitations, and in failing properly to weigh Plaintiff's testimony.

## BACKGROUND

### Work History

According to Plaintiff's work history report submitted with her application for SSI benefits, she worked at a hat factory from 1983 to 1987; at the video counter of a grocery store for a few weeks in 1987, a job she stated she had to quit due to severe anxiety; at an auto parts company from 1997 to 1998, stocking shelves and delivering parts; and as a chicken breast deboner at Tyson Foods from 1998 to 2000, where she developed tendinitis of the elbows. Plaintiff went on sick leave in early 2000, after which she did not return to work.

**Medical Record**

On March 5, 1999, when Plaintiff was still working at Tyson Foods, she reportedly told her gynecologist that she was looking for another job because she was developing arthritis in her hands.  Tr. 246.  On August 3, 1999, Plaintiff went to see the company doctor at Tyson Foods, James A. Critchlow, M.D., and reported problems with her elbows and wrists.  She had been working as a chicken breast deboner for about 16 months.  On August 20, 1999, Dr. Critchlow opined that Plaintiff had a repetitive motion injury to the dorsiflexes of her forearms.  He prescribed pain medication and restricted Plaintiff from lifting anything over 10 pounds and from using the dorsiflexes of her forearms.  On September 3, 1999, Dr. Critchlow administered two steroid injections, and on September 16, 1999, Plaintiff reported that her elbows were feeling much better, and that she had had immediate relief with the injections.  On October 7, 1999, Dr. Critchlow reported that he had "slowly introduced [Plaintiff] to the line," and that she had been doing quite well, but that she had had a hard day that day.  Dr. Critchlow opined, "I think at this time we just need to release her and see what she's able to tolerate."  Tr. 228-31.

On September 21, 2000, Plaintiff began treatment at Positive Resources, Inc., for anxiety.  She stated that she had been anxious since childhood and reported a recurrence of anxiety attacks since February 1998.  She stated that the attacks occurred if she was in a big store or driving on the highway.  The reported frequency of the attacks was about two times a week.  The intake assessment noted that Plaintiff had been on Xanax (an antianxiety medication) from February 1998 to February 2000.  She had also taken

Buspar (an antianxiety medication) at some point, which she claimed did not help. Plaintiff also complained of tennis elbow resulting from having worked as a deboner. Plaintiff was diagnosed with panic disorder with agoraphobia, generalized anxiety disorder, and a Global Assessment of Functioning (GAF) score of 45.[2] She was prescribed Xanax and Vistaril (an antihistamine with sedative properties). Tr. 302-07.

Four days later, another clinician at the same clinic, Khursheed Zia, M.D., diagnosed Plaintiff with panic disorder without agoraphobia and a GAF score of 55. Dr. Zia noted that Plaintiff had been on Xanax for three years and off her medication for three months. Tr. at 299-300. The record contains Dr. Zia's follow-up treatment notes from October 16, 2000 through March 23, 2001, which confirm his diagnosis of panic disorder without agoraphobia and note the various medications Plaintiff was prescribed. Tr. at 293-98.

The record also includes an intake assessment dated July 24, 2001, and approximately one year of monthly treatment notes thereafter, from Family Counseling Center, Inc. The intake assessment noted that Plaintiff's presenting problems were depression and anxiety, and that Plaintiff reported that she had been out of her medications (Inderol, Vistaril, and Zoloft) for about five months. Plaintiff stated that she

---

[2]  A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) 32. GAF scores of 31-40 indicate "major" impairments in social, occupational, or school functioning; scores of 41 to 50 reflect "serious" impairments in these areas; scores of 51-60 indicate "moderate" difficulties; scores of 61-70 indicate "mild" difficulties; scores of 71-80 indicate "slight" difficulties.

thought she "could make it" without the medications, but that she had deteriorated and could not even go into a store at that point. Plaintiff was diagnosed with general anxiety disorder, adjustment disorder with depressed mood, and a GAF score of 45. Medical therapy and a psychiatric evaluation were recommended. Tr. at 270-80.

On August 7, 2001, German Zhitlovsky, M.D., Plaintiff's treating psychiatrist at Family Counseling Center, reported a GAF score of 55. On September 5, 2001, Plaintiff reported that she was feeling better, and that her anxiety had decreased. On November 14, 2001, she was doing "much better" and driving, although not long distances. On December 20, 2001, Dr. Zhitlovsky reported that Plaintiff was doing "fairly well," still limiting her driving to short distances. Similar reports are contained in the record for February, March, April, May, and July 2002. In the May 2002 report, Dr. Zhitlovsky wrote that Plaintiff reported an improvement, and that she had gone to a graduation party and had been driving periodically, but he opined that more improvement was necessary, and that Plaintiff would benefit from individual therapy. On July 2, 2002, Plaintiff was again reported as doing fairly well. She was still taking Zoloft, Xanax, and Inderol. Tr. 259-69.

Meanwhile, Plaintiff was receiving treatment for pain in her elbows and arms at Southeast Missouri Health Network. Progress notes from March 19, 2002 through July 1, 2002 are included in the record. An x-ray taken on April 12, 2002, showed no fracture or other osseous abnormality. Plaintiff continued to complain of pain in her right arm and was given various pain medications. Tr. 282-86.

On August 14, 2002, non-examining psychiatrist, Peter Moran, D.O., completed a Psychiatric Review Technique form and a mental RFC assessment. On the review form, he indicated that Plaintiff had a medically determinable impairment, namely, panic disorder without agoraphobia, which resulted in mild limitation in activities of daily living and in maintaining concentration, persistence, or pace; and moderate limitation in maintaining social functioning. Dr. Moran opined that the records he reviewed did not establish the presence of "C" criteria,[3] and that Plaintiff was not significantly limited in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Dr. Moran opined that Plaintiff was moderately limited in the ability to work in coordination or proximity with others without being distracted by them, the ability to interact appropriately with the general public, and the ability to get along with coworkers or peers without distracting them or exhibiting behavior extremes. Tr. at 127-43.

Records from Orthopedic Associates dated January 6, 2003, show that Plaintiff presented for evaluation of bilateral arm pain. R. August Ritter, M.D., reported that by that point, the problem in Plaintiff's left elbow had resolved, but that her right elbow, as well as both arms, still hurt. Plaintiff received a steroid injection and was started on a bilateral upper extremity strengthening program. Tr. at 225. Plaintiff was seen again on

_____

[3] The Commissioner's listing for anxiety-related disorders is listing 12.06 of 20 C.F.R., Part 404, Subpart P, Appendix 1. This listing sets forth three criteria, "A," "B," and "C." The required level of severity for the disorder is met when both A and B are met, or when both A and C (complete inability to function independently outside the area of one's home) are met.

January 31, 2003, when Dr. Ritter reported that Plaintiff was "much improved," with full range of motion, no tenderness with palpation, and good strength, though with repetitive motion she was still getting "some bit of symptoms." The notes from this visit state that other than avoidance of repetitive motion, Plaintiff had no limitations. Tr. at 224.

On March 26, 2003, psychiatrist Talia Haiderzad, M.D., of Family Counseling Center, completed a check-box form entitled "Medical Source Statement - Mental."[4] Dr. Haiderzad indicated that Plaintiff was moderately limited in many aspects of understanding and memory, concentration and persistence, social interaction, and adaption; markedly limited in many other aspects of these categories; and extremely limited in three aspects (ability to work in coordination with or proximity to others without being distracted, ability to interact appropriately with the general public, and ability to travel to unfamiliar places or use public transportation). Tr. at 195-96.

Plaintiff made six visits to HealthSouth between January 8 and April 1, 2003, for treatment of her elbow condition, diagnosed as bilateral elbow epicondylitis (tennis elbow). Notes from the visit on February 28, 2003, reference two injections having been administered on January 8, 2003, and that the current level of Plaintiff's pain was 7 on a scale of 1 to 10. Treatment focused on reducing Plaintiff's pain and maximizing function related to activities of daily living and work. The notes indicate that Plaintiff tolerated treatment/therapeutic activity well. By April 1, 2003, when Plaintiff was discharged from

---

[4] It is not clear from the record whether and for how long Dr. Haiderzad had been treating Plaintiff prior to March 26, 2003; the only treatment notes in the record from Dr. Haiderzad date from July 9, 2003 through April 6, 2004.

skilled rehabilitative therapy to a home exercise program, her level of pain was 4/10 and 3/10, her muscle strength had increased, and her prognosis was considered good. Tr. at 197-221.

In a letter "To Whom it May Concern" dated April 2, 2003, Pedro Palomino, M.S.W., a clinical therapist at Family Counseling Center, wrote that Plaintiff's generalized anxiety disorder affected her daily functioning "considerably." He wrote that while Plaintiff had made some progress in dealing with her fears and anxiety, this progress was not sufficient to allow her to hold a job or take on activities that might cause her stress. He added that Plaintiff's psychiatric condition was severe, and that she would need psychiatric treatment for the rest of her life. Tr. at 194.

## Evidentiary Hearing of April 3, 2003

Plaintiff, who was represented by counsel, testified that she was 45 years old and had 13 years of education. She reviewed her employment history. Most recently, she had worked for Tyson Foods for 23 months, the last 16 of which she worked deboning chicken breasts. Plaintiff testified that she stopped working because of pain she developed in her arms from her elbows down. Plaintiff testified that she was receiving physical therapy for the problem and wearing hand braces. Tr. 21-24.

Plaintiff also testified that she had severe depression and anxiety. She stated that the anxiety began while she was in high school in the 1970s, and that in 1987 it was especially bad and she could not work. She testified that in 2000 she was depressed because she was in so much pain, and that she started having bad anxiety attacks again.

She started seeing a therapist and was prescribed medications which she was still taking -- Zoloft, Inderol, and Xanax. Plaintiff stated that for pain she was taking Celebrex, Relafen, Bextra, Naprosyn, and Aleve.[5] Tr. at 24-27.

Plaintiff testified that she was getting her strength back in her arms, but that they were still weak. She stated that she could lift a gallon of milk using both hands. She also stated that sometimes her hands would cramp up and that she experienced tingling and numbness in them, but that it was her arms rather than her hands that really bothered her. Plaintiff testified that crowds of people and being in large stores caused her to have anxiety attacks. She testified that a relative would go grocery shopping for her, and that if she went along, she would wait in the car. She enjoyed shopping in smaller stores like consignment shops. She did not go to church or belong to any social groups. Driving on the interstate made her "really nervous," and she would have to take two Xanax before driving any significant distance. Tr. at 27-29.

Plaintiff testified that physical therapy was helping with the pain in her arms. If she were not doing anything, her pain would average about a 3 or 4 on a scale of 1 to 10. Any repetitive activity, like vacuuming, mopping, or dusting, would make the pain worse. She was currently taking Aleve and Naprosyn for the pain. Plaintiff testified that she generally got up at 6:00 a.m., and that during the day she watched TV and did some

---

[5] The ALJ asked Plaintiff "Are you taking anything for pain?" Plaintiff responded, "Yes, I've taken [the medications listed above]."

housework like vacuuming, laundry, and making her meals.  On occasion, her young

grandchildren would visit.  Tr. at 30-33.

The ALJ asked the VE if there were jobs available for an individual (of Plaintiff's

age, education, and work experience) who was restricted to the lifting and carrying

restrictions of light work,[6] had problems using her hands, could not do manipulations that

required good grip strength, and could use her hands for manipulation of small, very, very

light things, like change.  The VE responded that there would be jobs for such an

individual, such as usher; ticket taker; plant guide; attendant in rest rooms, hot rooms, or

locker rooms; as well as the sedentary jobs of unskilled cashier and some sedentary

inspection jobs.  The VE stated that he did not cite jobs like light cleaning or janitorial

work because such jobs required frequent use of the hands.    The VE then testified that if

the individual also had a panic disorder that would make it difficult for her to deal with

the public on an ongoing basis, all of the cited jobs except that of inspector would be

---

[6]    "Light work" is defined in 20 C.F.R. § 404.1567(b) as work that involves
lifting no more than 20 pounds at a time, with frequent lifting or carrying of up to 10
pounds; and that might require a good deal of walking or standing, sitting most of the
time, and some pushing and pulling of arm or leg controls.  Social Security Ruling (SSR)
83-10 elaborates that the full range of light work requires standing or walking, off and on,
for a total of approximately 6 hours of an 8 hour work day, while sitting may occur
intermittently during the remaining time; that the lifting requirement for the majority of
light jobs can be accomplished with occasional, rather than frequent, stooping; and that
many unskilled light jobs are performed primarily in one location, with the ability to
stand being more critical than the ability to walk.  SSR 83-10, 1983 WL 31251, at *6
(1983).

eliminated. Lastly, the VE testified that if Dr. Haiderzad's assessment were factored in, there would be no jobs such an individual could perform. Tr. at 34-36.

**Post-hearing Evidence**

Steve Larsen, Ph.D., a consulting clinical psychologist, conducted a mental status exam of Plaintiff on May 28, 2003. Dr. Larsen noted that Plaintiff told him that her counselor (Mr. Palomino) had discharged her from therapy because she was doing so well. Dr. Larsen noted that Plaintiff was wearing braces on her wrists. He saw no evidence during the exam that Plaintiff was seriously depressed or anxious. He wrote that Plaintiff reported that she could do self-care functions such as some cooking, light cleaning, and laundry, and that she went shopping in small stores and at garage sales and flea markets. She also told Dr. Larsen that her grandchildren often came over in the evening, and that the oldest one would often stay overnight with her. Plaintiff said that she used to be unable to leave her house at all, but now she was able to do so occasionally. According to Dr. Larsen, Plaintiff reported having panic attacks about twice a week, and that they usually occurred when she was around other people. Tr. at 174-75.

Dr. Larsen reported that Plaintiff demonstrated average memory, attention skills, and concentration skills, and was believed to be functioning at the low average level of intelligence. He noted that Plaintiff did not have any problems sitting in the waiting room with other people, and he stated as follows with regard to the result of a personality test (the MMPI): "This patient's validity profile indicated that she answered the test

questions in a greatly exaggerated manner likely designed to get disability benefits. Because of this, the results of this test are not considered to be valid." Tr. at 175-77.

Dr. Larsen also completed a check-box form assessment of Plaintiff's ability to do work-related activities. He indicated that on a scale of very good/good/fair/poor, Plaintiff's ability in all areas (such as following work rules, dealing with work stresses, behaving in an emotionally stable manner) was good, except that in the area of dealing with the public, her ability was good to fair. Dr. Larsen stated that Plaintiff had mild panic disorder, but was still leaving the house on a regular basis, and that she had low average intelligence and average attention, concentration, and memory. He opined that Plaintiff had "no serious problems" in her ability to make personal and social adjustments. Tr. at 178-79.

The record also contains monthly progress notes of Dr. Haiderzad from July 9, 2003 through April 6, 2004, with some of these notes post-dating the ALJ's decision of September 2, 2003. Plaintiff was maintained on various antianxiety medications. The notes from January 24, 2004, report that Plaintiff said she was hardly driving. The notes from February 2, 2004, state that Plaintiff was going through a rough time; as of March 25, 2004, she was described as still having anxiety problems and being anxious around crowds; and on April 6, 2004, it was noted that she felt anxious and panicky when driving. Tr. at 353-66.

**ALJ's Decision of September 2, 2003, and Remand by Appeals Council**

The ALJ held that Plaintiff had a severe impairment, but not one that met the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found that Plaintiff's testimony about disabling symptoms was not credible, and he gave little weight to the functional assessments of Plaintiff's treating counselor (Mr. Palomino) and psychiatrist (Dr. Haiderzad). The ALJ determined that Plaintiff could perform light work -- lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking six hours in an eight-hour workday -- which avoided significant social interaction with the public. The ALJ concluded that Plaintiff could not return to her past work because it involved lifting and carrying 50 pounds or more. The ALJ then concluded, purportedly based upon the VE's testimony, that Plaintiff could be a house cleaner, assembler, packer, or light janitor. Tr. at 320-27.

Upon Plaintiff's request for review of the ALJ's decision, the Appeals Council noted that the VE did not testify to the incidence of janitorial/cleaning jobs in the economy; did not testify to whether Plaintiff's need to avoid significant contact with the public would affect her ability to perform these jobs; and did not mention the jobs of assembler and packer cited in the ALJ's decision. Accordingly, on December 12, 2003, the Appeals Council vacated the ALJ's decision and remanded the case for additional testimony by a VE, and directed the ALJ to offer Plaintiff the opportunity for another hearing.

**Some New Evidence**

As noted above, the record includes progress/treatment notes of Dr. Haiderzad through April 6, 2004. In addition, in a letter "To Whom it May Concern" dated June 16, 2004, Dr. Haiderzad, stated that Plaintiff had severe anxiety disorder, and that this type of disorder could affect a person's ability to function and carry out normal daily life activities such as holding a job. Tr. at 352.

**Evidentiary Hearing of June 25, 2004**

Plaintiff's testimony at the second hearing was consistent with that at the first hearing. She testified that she was still having problems with tingling, numbness, inflammation, and pain in her arms, and that, due to her tendinitis, she did not have any strength in her arms. She testified that it had been over a year since her last injection, which did not help her as the first one had. Plaintiff stated that she was told by her doctors not to lift over ten pounds and not to do repetitive work. She testified that extending her arms out in front of her caused immediate pain, 90/100 in her right arm and 50/100 in her left arm. She also testified that her grip strength was "not strong at all," but that she could handle buttons and zippers. She testified that she did very little grocery shopping, and that the heaviest thing she could lift was a two-liter bottle of soda or a gallon of milk. Tr. at 45-49.

Plaintiff testified that she had severe anxiety and depression for which she had been in treatment on and off since the 1970s, but that with the help of medication it had not gotten worse since she stopped working. Upon further questioning by the ALJ,

Plaintiff stated that her anxiety and depression had gotten worse since she stopped working due to problems in her life, such as finances.   She testified that she lived alone, but that she saw her son every day and also saw her boyfriend of 20 years.  Plaintiff testified that she took care of her own household chores, but had to take a break every 15 to 20 minutes.  She testified that she vacuumed using her left arm, because it would be too painful to use her right arm.  Tr. at 50-53.

Plaintiff stated that she was still seeing her psychiatrist, Dr. Haiderzad, once a month, and was also seeing a therapist once a month (presumably Mr. Palomino), who gave her some strategies to use, such as breathing treatments.  She testified that she did not feel that she could work, primarily due to her anxiety and depression, as opposed to her pain.  She believed that she would tear-up while at work and not be able to concentrate, and that she could not handle the stress of a job.  She testified that she would get panic attacks when around people she did not know -- her heart would race, her hands would get sweaty, and she would  "splotch up."  She testified that it had been very hard for her to come to the hearing, and that she felt the symptoms of an attack.  The ALJ noted that Plaintiff's neck had become "totally red," and that the color was moving up into her face, and Plaintiff testified that she felt very hot.  Plaintiff declined the ALJ's offer to take a break.  Tr. at 53-58.

Plaintiff stated that her anxiety attacks usually lasted about 15 minutes and would be brought on by being away from home and near other people.  She testified that she had had such attacks when she worked at Tyson Foods, due to stress and pain.  She would go

to a restroom or the nurses station for about 20 minutes, wait for the attack to pass, and then return to work. She was usually permitted to leave her work station, but if she were not, she would manage to work through the attack. Plaintiff again testified that her two grandchildren (then two and four years old) would sometimes visit her with her son. She would watch the children play, but she did not babysit for them. Tr. at 60-63.

Plaintiff testified that on a typical day, she would wake up at 6:00 a.m. and get out of bed at about 10:00 a.m. She would eat, watch TV, and take a nap from 2:00 to 4:00 p.m. Sometimes her son would come by to visit. After dinner she would watch TV or her boyfriend would come over. Plaintiff testified that about twice a week she would drive herself somewhere, but was very nervous while driving and would take an extra Xanax beforehand. Plaintiff testified that she has felt about the same since January 1, 2000. Tr. at 63-67.

The ALJ asked the VE whether there were any available jobs for an individual of Plaintiff's age, education, and work experience who had an anxiety-related disorder, which imposed moderate limitation on the ability to work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and who had tendinitis of the elbows precluding work that required more than occasionally extending the arms at the elbow area. The VE testified that such an individual could perform the unskilled light jobs of usher, furniture rental consultant, and the sedentary job of surveillance system operator. He testified that

there were 1,000 usher jobs available locally and over 33,000 nationally; over 3,000 furniture rental consultant jobs locally and over 40,000 nationally; and 600 surveillance system operator jobs available locally and over 3,000 nationally.

The VE further testified that the hypothetical individual could perform the three jobs he had identified even if she needed a low stress job. The VE testified, however, if the individual would have a panic attack approximately once every two weeks that would take her from the work area for approximately 20 minutes, she would not last 90 days at any of the three jobs, which were all unskilled. Tr. at 80-85.

## ALJ's Decision of August 30, 2004

The ALJ accepted and adopted by reference the "decision rationale" of the first ALJ, "except to the extent that it conflicts with the current rationale and findings." Tr. at 12. The ALJ found that Plaintiff had an anxiety disorder and epicondyle tendinitis, impairments that were severe but did not meet, singly or in combination, a listed impairment. The ALJ found that Plaintiff's allegations that she had such severe panic attacks and physical pain that she could not do any work for any continuous period were not credible. He pointed to Dr. Larsen's finding that Plaintiff exaggerated her symptoms.

The ALJ stated that he did not put any weight on Dr. Haiderzad's opinion that Plaintiff had marked limitations in many areas of mental functioning. His reasons were as follows: The opinion was based upon Plaintiff's alleged symptoms; the opinion was suspect given Dr. Larsen's findings; and Dr. Haiderzad's treatment notes failed to reveal that Plaintiff had any mental abnormality that would support the conclusion that she was

severely limited in her functional mental capacity. The ALJ also noted that no treating or examining source ever described in detail any observation of "a true panic attack" experienced by Plaintiff. Tr. at 12-13.

In finding Plaintiff's allegations of a disabling mental impairment not credible, the ALJ asserted that Plaintiff testified that she had improved to the point where she had only one panic attack every two weeks or so, and that they lasted only about 10 minutes. He noted that she testified that she had such attacks while working at Tyson Foods, and that if her employer did not let her leave her work station, she would stay on the line and work through these episodes. The ALJ also relied upon the fact that when Plaintiff was working at Tyson Foods, she told her doctor that she was going to look for different work due to the problems with her arms, indicating that Plaintiff did not think her mental status precluded her from working. The ALJ concluded that Plaintiff's panic attacks were "no more than mild to moderate" and did not preclude her from performing work activity.

The ALJ also believed that the record showed that Plaintiff was able to engage in "relatively normal" daily activities, in that Dr. Larsen reported that she stated that she could go shopping and to yard sales, do all self-care functions, cook, clean, and do laundry. In addition, the ALJ noted that Plaintiff drove and spent time with her grandchildren. Tr. at 13.

Turning to Plaintiff's physical impairment, the ALJ stated that because there was little radiological or other objective evidence that Plaintiff had a significant arthritic or neurological condition, he gave her "the marked benefit of the doubt" in finding that she

had "some physical limitations." The ALJ concluded that Plaintiff had the mental and physical RFC to perform light work that did not require more than occasional flexing and extension of the elbow or working in close proximity to others without being distracted by them. The ALJ stated that the VE testified that a person with this RFC could work as an usher, furniture rental consultant, or surveillance system monitor. Accordingly, the ALJ concluded that Plaintiff was not under a disability as that term is defined in the Social Security Act. Tr. at 14-15.

## STANDARD OF REVIEW AND STATUTORY FRAMEWORK

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoted case omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . the court must "also take into account whatever in the record fairly detracts from that decision." Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to SSI benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a

medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A).   Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id. § 423 (d)(2)(A).  Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months.  Barnhart v. Walton,  535 U.S. 212, 217-22 (2002).  The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, SSI benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment, or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities, including physical functions, such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; understanding, carrying out and remembering simple instructions; using judgment, responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

In evaluating the severity of mental impairments, the ALJ must make specific findings as to the degree of limitation in each of the following functional areas:  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).

If the claimant's impairment is not severe, the claim is denied. If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulation, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work, if any. If the claimant has past relevant work and is able to perform it, she is not disabled. If she cannot perform her past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

Where a claimant cannot perform the full range of work in a particular category of work defined at 20 C.F.R. § 1567 (very heavy, heavy, medium, light, and sedentary) due to nonexertional impairments, such as pain or mental disorders, the Commissioner must present testimony by a VE to meet his burden at step five. Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998). A VE's response to a hypothetical question that includes all of a claimant's impairments and limitations can constitute substantial evidence at step five to support a conclusion of no disability. Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001). The hypothetical question must

capture "the concrete consequences of a plaintiff's deficiencies." Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). The question need not include alleged limitations which the ALJ properly discredits. Haggard v. Apfel, 175 F.3d 591, 594-95 (8th Cir. 1999).

Here, the ALJ concluded at step four that Plaintiff could not perform any past relevant work. At step five the ALJ concluded, based upon the VE's answers to the ALJ's questions, that Plaintiff was not under a disability as that term is defined in the Social Security Act.

## DISCUSSION

### ALJ's Reliance on Opinion of Consulting Psychologist rather than of Treating Psychiatrist

Plaintiff argues that the ALJ erred in relying upon Dr. Larsen's May 28, 2003 mental assessment of Plaintiff, as opposed to Dr. Haiderzad's March 26, 2003 medical source statement. As noted above, Dr. Larsen opined that Plaintiff had only a mild panic disorder, and that her ability to do work-related activities was generally good, whereas Dr. Haiderzad indicated that Plaintiff was moderately, markedly, and even extremely limited in various work-related categories of mental functioning. Also as noted above, the ALJ found that Plaintiff's mental impairments imposed only a moderate limitation on her ability to work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Plaintiff points to Mr.

Palomino's letter, which stated that Plaintiff could not hold a job, as supportive of Dr. Haiderzad's opinion.

In evaluating medical opinion evidence, the ALJ is to consider the nature and extent of the examining/treatment relationship, the supportability of the opinion, the consistency of the opinion with the rest of the record, and the specialization of the medical source. 20 C.F.R. § 404.1527(d). A treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole. Treating physicians' opinions are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). Furthermore, treating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because those are opinions on the application of the statute, a task assigned to the discretion of the Commissioner. Id.; Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

Here, the ALJ did not discount Dr. Haiderzad's opinion altogether. At step two of the analysis, he determined that Plaintiff's anxiety-related impairment was severe. He did not accept Dr. Haiderzad's opinion that Plaintiff was markedly and/or extremely limited in various work-related functions. As noted earlier, it is not clear from the record whether

and for how long Dr. Haiderzad had been treating Plaintiff prior to March 26, 2003, the date Dr. Haiderzad completed the medical source statement at issue. The only treatment notes in the record from Dr. Haiderzad date from July 9, 2003 through April 6, 2004. Dr. Haiderzad's letter of June 16, 2004, does label Plaintiff's anxiety-related disorder as severe, but the letter is rather equivocal in stating that such a condition "could affect a person's ability" to hold a job. There is no indication as to whether or not Plaintiff's medications controlled her condition sufficiently to allow her to work at a job which met the mental restrictions found by the ALJ. And while Mr. Palomino stated in April 2003 that Plaintiff had not yet made sufficient progress to hold a job, in May 2003 Plaintiff advised Dr. Larsen that Mr. Palomino had discharged her from therapy because she was doing so well.

In light of the above, the Court does not believe that the ALJ committed reversible error in not accepting the functional limitations assessed by Dr. Haiderzad as controlling. See Randolph v. Barnhart, 386 F.3d 835, 389 (8th Cir. 2004) (ALJ did not err in not giving treating psychiatrist's checklist medical source statement prepared after meeting with Plaintiff three times controlling weight; letter in which this doctor opined that plaintiff was unable to work was not entitled to controlling weight; citing SSR 96-5p, noting that such an opinion, even when given by a treating source, is not entitled to controlling weight "or given special significance," because this is a matter for the ALJ to decide). Similarly, the Court does not believe that the ALJ erred in not according Mr.

Palomino's letter of April 2, 2003, stating that Plaintiff could not work, controlling weight.

## ALJ's RFC Determination, Discrediting Plaintiff's Testimony, and Hypothetical Question Posed to the VE

These arguments are all related. Plaintiff argues that, besides the ALJ's error in discrediting Dr. Haiderzad's opinion regarding Plaintiff's mental RFC, the ALJ's physical RFC determination is not supported by an assessment from an examining medical source. Plaintiff further argues that the ALJ's reasons for discrediting Plaintiff's testimony as to the extent of her impairments were not legally sufficient. Plaintiff argues that as a result of this, the hypothetical question posed to the VE did not reflect Plaintiff's true condition, and the answer to the question was not a proper basis for a finding that Plaintiff was not disabled.

A disability claimant's RFC reflects what she can still do despite her limitations. 20 C.F.R. § 404.1545(a). The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (citation omitted). Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question," and "'some medical evidence must support the

determination of the claimant's [RFC].'" Id. at 1022 (quoting Hutsell , 259 F.3d at 711).

The ALJ is therefore required to consider at least some supporting evidence from a

medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Before determining a claimant's RFC, the ALJ must evaluate the claimant's

credibility with respect to the severity of her limitations. Pearsall v. Massanari, 274 F.3d

1211, 1218 (8th Cir. 2001). In Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)

(subsequent history omitted), the Eighth Circuit held that the "absence of an objective

medical basis which supports the degree of severity of subjective complaints alleged is

just one factor to be considered in evaluating the credibility of the testimony and

complaints." Id. at 1322. The Court explained that in evaluating a claimant's subjective

complaints of pain, an ALJ must also consider "observations by third parties and treating

and examining physicians relating to such matters as (1) the claimant's daily activities;

(2) the frequency, duration, and intensity of the pain; (3) precipitating and aggravating

factors; (4) dosage, effectiveness and side effects of medication; and (5) functional

restrictions." Id.

After considering the Polaski factors, the ALJ must make express credibility

determinations and set forth the inconsistencies in the record that caused him to reject the

plaintiff's complaints. Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998). "The

decision of an ALJ who seriously considered, but for good cause expressly discredits a

claimant's subjective complaints . . . is not to be disturbed." Haggard v. Apfel, 175 F.3d

591, 594 (8th Cir. 1999). "If the ALJ discredits a claimant's credibility and gives a good

reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In many disability cases, there is no doubt that the plaintiff is experiencing pain; "the real issue is how severe that pain is." Sampson v. Apfel, 165 F.3d 616, 619 (8th Cir. 1999).

Here, the ALJ accepted Plaintiff's allegations of pain to the extent that she was limited to light work (and that she could do sedentary work) that did not require more than occasional flexing and extension of the elbow. As the ALJ stated, there was little radiological or other objective evidence that Plaintiff had a more significant arthritic or neurological condition. On January 31, 2003, Dr. Ritter reported that Plaintiff was "much improved," with full range of motion, no tenderness with palpation, and good strength, and that she had no limitations other than avoidance of repetitive motion. And on April 3, 2003, Plaintiff was released from physical therapy with a good prognosis. In addition, the record and Plaintiff's testimony supports a conclusion that the reason she could not return to her former work at Tyson Foods, from a physical standpoint, was essentially because it required repetitive flexing and extension at the elbow. Plaintiff herself testified that it was not so much her pain that prevented her from working, but rather her depression and anxiety.

With respect to Plaintiff's mental RFC, the ALJ found that her mental impairments imposed a moderate limitation on her ability to work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, and get along with co-workers or peers without distracting them or exhibiting behavioral

27

extremes.  The Court concludes that the ALJ was entitled to discount Plaintiff's testimony that approximately every two weeks she would have a  panic attack that would require her to leave her work area for approximately 20 minutes.  The record, including Plaintiff's testimony, suggests that her panic attacks were situational, that is, brought on by being in a large store, being in groups of people she did not know, driving on highways, and stress.  If Plaintiff had a job that did not include such situations, there is no evidence that she would have a panic attack requiring her to leave her work area for 20 minutes once every two weeks.

Furthermore, as the ALJ noted, Plaintiff told a physician in March 1999, while she was working at Tyson Foods, that she was looking for another job due to the physical requirements of the job at Tyson Foods.  The Court believes that the ALJ drew a fair reference that at that point Plaintiff did not believe her anxiety disorder precluded her from working.  Although there is evidence that her mental condition deteriorated after she left Tyson Foods, the record suggests that this was because Plaintiff went off her medications.  The record indicates that once she sought treatment in September 2000 and was back on her medications and receiving psychotherapy, her condition improved.  In August 2001, she was assessed a GAF of 55, indicating only moderate difficulties in functioning.  In November 2001 her treating psychiatrist (Dr. Zhitlovsky) reported that she was doing "much better," and thereafter through July 2002 that she was doing fairly well.  The Court adds that although Plaintiff apparently had a panic attack at the April 3,

2003 hearing, presumably due to the stress of the situation, she declined the ALJ's offer to take a break.

In sum, the Court believes that the ALJ's hypothetical question set forth above posed by the ALJ to the VE sufficiently captured Plaintiff's impairments. The Court, however, is troubled by the VE's opinion that a person who had such impairments could be an usher, a job that would entail dealing with the general public on a constant basis. A closer question is presented with regard to the VE's opinion that Plaintiff could be a rental furniture consultant. Plaintiff testified that she liked to shop in small consignment stores and at flea markets. The contact with the general public in such situations would seem to be at the same level as being a rental furniture consultant. In any event, the Court concludes that the VE's opinion, and the ALJ's decision based upon it, that Plaintiff could perform the job of surveillance system monitor, is supported by substantial evidence in the record as a whole. The VE testified that there were 600 such jobs available locally and over 3,000 in the national economy.

The Court is satisfied that, in sum, the VE identified jobs Plaintiff could perform that were available in significant numbers. See Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997) (650 jobs in the field of surveillance monitoring available in plaintiff's state (Iowa) and over 30,000 available nationally constituted significant numbers); Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 sedentary security jobs within region was significant number, especially in light of plaintiff's 25 years of experience as a security guard).

## CONCLUSION

Although there is evidence in the record that could support a different decision, upon review of the entire record, the Court concludes that the Commissioner's decision that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the ALJ is affirmed.

An appropriate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 14th day of March, 2006